## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CYNTHIA PEPE,**

        **Plaintiff,**

**v.**

**NATIONAL TECHNOLOGY AND ENGINEERING SOLUTIONS OF SANDIA, LLC,**

**dba SANDIA NATIONAL LABORATORIES, and**

**LILILANA SHELTON, in her official and individual capacities,**

        **Defendants,**

## <u>COMPLAINT FOR VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT AND THE AMERICANS WITH DISABILITIES ACT</u>

### I.      <u>Nature of the Action</u>

COMES NOW Ms. Pepe, Plaintiff, by and through her attorney of record, Heather Burke to file this Complaint For Violations Of The Family and Medical Leave Act 29 USCS §§ 2601 et seq, and the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.

### II.      <u>Parties</u>

1. Ms. Pepe is a United States Citizen and resident of New Mexico.

2. Defendants live and/or do business in New Mexico

1

3.  Sandia National Laboratories is located on Kirtland Air Force Base, which is a federal enclave.

### III.    Jurisdiction

4.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 1343.

5.  The Court has subject matter and personal jurisdiction over Defendants because it was at all times herein alleged conducting business in New Mexico.

6.  Defendants took the unlawful, retaliatory, and/or tortious acts herein alleged within this Judicial District and/or took wrongful acts that had effects in New Mexico

7.  Venue is appropriate in this district.

### IV.    Exhaustion of Administrative Procedures

8.  Plaintiff timely filed a charge of discrimination under the ADA with the EEOC.  She satisfied all administrative requirements and received an order of non-determination on March 7, 2025, which allows her 90 days to file her complaint in Federal District Court.

### V.    Factual Background to This Litigation

9.  Ms. Pepe began working at Sandia National Laboratories("SNL") on February 19, 2001.

10. Plaintiff suffers from a mixed anxiety and depression disorder.

11. This condition qualifies as a life affecting disability under the ADA, and a qualifying medical condition under the FMLA.

12. For the vast majority of her employment at SNL, Plaintiff was rated as a high performer.

13. Plaintiff began taking low dosage of anxiety medication while she simultaneously worked full time and completed her bachelor's and master's degrees.

14. During that time, she continued to be rated as a high performer in her positions at SNL.

15. On May 8, 2020, Plaintiff started the L1 Manager for 2963 with Design Engineering.

16. However, the chronically hostile work environment in the Design Engineering department caused Plaintiff's anxiety to increase.

17. In September 2022, a reorganization moved Deign Engineering to Center 2900 under Lani Sanders instead of under Ernie Wilson as Director,

18. Lani Sanders recruited Defendant Shelton Defendant Shelton, things grew much worse and Plaintiff began to suffer increasingly severe anxiety and panic attacks.

19. In a one-on-one meeting with manager Defendant Shelton Defendant Shelton on August 17, 2023, Ms. Pepe disclosed the fact that leadership issues in the department were triggering significant anxiety.

20. Ms. Defendant Shelton responded that she needed to just "get over it" and that it was a "new leadership team" and Ms. Pepe needed to just "let it go."

21. Defendant Shelton was openly hostile to Plaintiff's disability.

22. Two weeks later, on August 31, 2023, Ms. Pepe began EAP counseling sessions.

23. On or about September 13, 2023, Ms. Pepe informed Defendant Shelton of the fact she was attending EAP counseling because of her stress and anxiety about work.

24. On September 14, 2023, Ms. Pepe went to the Sandia Medical Facility because of chest pain and rapid breathing.  She was diagnosed with having a panic attack.

25. Defendant Shelton was informed of Ms. Pepe's whereabouts and absence from the group BBQ, and she called Ms. Pepe on her work cell phone and checked in via Teams chat message.

26. Defendant Shelton gave Plaintiff no recommendation at that time and did not give Ms. Pepe notice of her FMLA rights, or provide any FMLA paperwork to her at this meeting, or any time afterwards.

27. On October 3, 2023, Ms. Pepe again spoke with Defendant Shelton about FMLA, including her discussions with EAP and her physician.

28. Defendant Shelton again did not provide FMLA paperwork to Ms. Pepe.

29. On October 19, 2023, Plaintiff spoke with her mentor, Nayeli Perez, regarding her health concerns and feeling like she needed mentorship to excel in her current role. Nayeli requested that Plaintiff be as transparent as possible in her feedback so that the mentorship could have maximum efficacy.

30. On October 26, 2023, Defendant Shelton and Emily Doty from HR met with Plaintiff for her end of year performance review.

31. For the first time in her career at Sandia, Plaintiff was rated poorly and a Performance Evaluation Plan ("PEP") was triggered.

32. No consideration of Pepe's disability was included in her review, nor was she given notice of her right to take FMLA protected leave for it.

33. Defendant Shelton and Ms. Doty stated that they would discuss the timeline with Lani Sanders.

34. Ms. Pepe had previously obtained approval to travel for business development travel to Nevada for Nuclear Weapon Management Onboarding Cohort ("NWMOC") training on October 30, 2023, which would cause delay in the PEP response deadline.

35. At 4pm on October 26, 2023, Plaintiff was called to Defendant Shelton's office and was told that Lani Sanders had cancelled her NWMOC training only a couple of days before Plaintiff was scheduled to travel.

36. Plaintiff told Defendant Shelton that Plaintiff's husband was also scheduled to travel and so this last-minute cancellation would cause greater disruption.

37. Defendant Shelton approved travel and telework for Plaintiff, but Plaintiff was still not allowed to attend the NWMOC training

38. On or around October 31, 2023, Plaintiff had a 1:1 mentor meeting with Nayeli Perez. During this meeting, Plaintiff shared her computer screen so that Ms. Perez could see Plaintiff's PEP deliverables.

39. Ms. Perez expressed serious concerns about the PEP deliverables that Defendant Shelton was requiring, stating that it was "too much" and would take a lot of work to get a plan together for each one.

40. The mentor meeting was cut short by a fire alarm requiring evacuation of Plaintiff's hotel.

41. As a result of the fire alarm, Plaintiff attended a TEAMS meeting with Defendant Shelton from her vehicle

42. In this meeting, Plaintiff enquired about salary and pension impacted should she decide to step down from her management position.

43. Ms. Doty did not know whether there would be a salary reduction if Plaintiff stepped down, but stated that if Plaintiff was fired, Plaintiff's pension would stay intact and Plaintiff could pursue COBRA insurance.

44. At no time did Plaintiff ever request or agree to step down from her position, and merely asked for information to investigate potential options.

45. On October 31, 2023, Ms. Pepe submitted the signed performance decision letter indicating Option A, to complete a Performance Expectation Plan within 60 days.

46. Ms. Pepe submitted deliverables per the PEP requirement.

47. On October 31, 2023, Defendant Shelton requested a meeting to discuss Lani Sanders reaction to Ms. Pepe's working remotely. Defendant Shelton expressed Lani was upset I was approved to work remotely. Defendant Shelton expressed that Lani thinks "Ms. Pepe does not appreciate the significance of a PEP" and was angry with Defendant Shelton's approval as much as she is with Ms. Pepe.

48. October 31, 2023: Around 4pm, Defendant Shelton Defendant Shelton directed Ms. Pepe to return to NM and not continue to work via telecommute from NV.

49. Feeling overwhelmed, stressed, and anxious, Ms. Pepe worked to identify and move travel plans to return to NM. Ms. Pepe did inform Defendant Shelton that she would need to be unavailable to address this as it was too much creating panic

50. Ms. Pepe sent an email that Ms. Pepe traveled based on Defendant Shelton's approval and informed Defendant Shelton she would be working on securing return flights for herself and her spouse.

51. November 1, 2023, Defendant Shelton emailed response capturing her perspective of our discussion for approval to telecommute from Las Vegas. justifying her approval of travel and work telecommuting from NV.

52. Defendant Shelton called Ms. Pepe distraught and again claimed Ms. Pepe did not grasp the severity of the situation. Defendant Shelton also indicated the work trip was canceled due to Ms. Pepe's own performance issues even though the scheduled training would have been beneficial to Plaintiff's work performance.

53. November 2, 2023, Ms. Pepe met with Defendant Shelton face-to-face on PEP deliverables. Feedback not given per process defined by Defendant Shelton Defendant Shelton in weekly check in expectations email which is that the meeting summary was to be sent directly after meeting.

54. Feeback for the November 2nd meeting was not given until November 6.

55. On November 6, Defendant Shelton canceled the weekly check in scheduled for December 26, 2024, which caused Plaintiff to suffer anxiety, as there was no realistic opportunity for her to meet the already arduous PEP expectations.

56. On or about November 14, 2023: Defendant Shelton Defendant Shelton cancelled weekly check-in for November 21, 2023 due to her travel out of town for the holiday. Defendant Shelton specified Plaintiff was to submit both November 20 and 27th on time, without feedback, per Lilana's expectations. Lilana would not provide feedback on both weeks until November 28, 2023.

57. It was clear to Plaintiff by Defendant Shelton's words and actions that Defendant Shelton was not committed or even interested in helping Plaintiff to succeed, and in fact, seemed to be undermining the PEP process.

58. This caused tremendous anxiety and made Plaintiff consider stepping down from management.

59. November 15, 2023: Defendant Shelton Defendant Shelton sent a follow-up from 11/13/2023 meeting and indicated she was aware Plaintiff was 'continuing to work with Employee Assistance Program for Ms. Pepe's anxiety and physical ailments and that she encouraged Ms. Pepe to continue working with them.

60. Defendant Shelton also finally notified Plaintiff of her right to pursue "protected leave time."

61. On November 15, 2023 Ms. Pepe met with her primary care physician to discuss her anxiety, which included a discussion of FMLA.

62. Plaintiff submitted FMLA paperwork through the online HR system that day.

63. The following day, November 16, 2023, Plaintiff was notified that her FMLA certification had been approved, and received her designation notice.

64. This was 3 months after she had first given notice of her need for FMLA to her supervisor.

65. On November 16, 2023, Defendant Shelton sent an email, copying Emily Doty and Teresa Ostrem from HR, which treated Plaintiff's question about potentially stepping down as a decision which had already been made.

66. Defendant Shelton requested an updated resume so that Ostrem could begin looking for an alternate position for Plaintiff.

67. On November 17, Plaintiff requested clarification on the objective of a deliverable. Defendant Shelton was unable to provide clarification and did not seem to understand

what was expected of Plaintiff, but wanted to create the optics that Plaintiff was failing to deliver.

68. On November 29, Plaintiff sent an email to Defendant Shelton asking whether there would be funding support available to transfer Plaintiff to a new position if that was what she decided.

69. On November 30, Defendant Shelton messaged another manager, instructing him to tell Plaintiff to leave her current meeting immediately to meet with Defendant Shelton.

70. Plaintiff joined a TEAMS meeting with Defendant Shelton and noted that Emily Doty from HR was also present.

71. Defendant Shelton and Doty presented a memo for Plaintiff to sign confirming that Plaintiff had voluntarily agreed to step down from her position as Manager, in lieu of completing the PEP.

72. Plaintiff tried to explain that she had only been asking about stepping down as a potential option, but not that she had made any decision at all to do so.

73. Defendant Shelton claimed to be unaware that Plaintiff had even asking whether there was funding to move her position, and had not considered the financial impact at all.

74. This triggered an enormous panic attack on Plaintiff's part, and she was forced to cut the meeting short, and go home.

75. That same day, Defendant Shelton sent an email, copying Doty, with the proposed memo and a deadline to sign it by COB that same day.

76. Plaintiff responded to the email stating that the entire discussion of stepping down had only come up because Defendant Shelton had professed, during in person

meetings, to be champion of Plaintiff's wellness and so she was under the impression they were just exploring options, not making any permanent or definite decisions.

77. Plaintiff also stated that she had been completely blindsided by the meeting subject, and wasn't prepared for resignation to be discussed at all.

78. Plaintiff also stated that Defendant Shelton was aware that Plaintiff had requested time to prepare before high stress meetings and situations due to it triggering involuntary panic attacks.

79. She also stated that there were numerous questions not addressed in the memo, its impact on FMLA, and it did not take into account the holiday shutdown time at Sandia when it would be virtually impossible to find another position.

80. Plaintiff stated she needed to understand all the implications before she could address it or agree to it.

81. At no time did Plaintiff ever agree to sign the memo or to step down from management.

82. On December 1, Plaintiff had been unable to sleep and was not feeling well. She requested to work from home, but was told to take FMLA time instead.

83. Doty sent an email stating that if Plaintiff was taking FMLA time, the deadline to sign the memo could be extended until Monday December 4, 2023.

84. On December 4, 2023, Defendant Shelton sent an email entitled "next steps" in which she documented her expectation that Plaintiff was stepping down and that the weekly PEP meetings would be discontinued and that Plaintiff no longer needed to provide weekly updates.

85. On December 4, 2023, Plaintiff sent a Memo of Understanding ("MOU"), and requested feedback to ensure that she and Defendant Shelton were on the same page before discontinuing the PEP.

86. Defendant Shelton did not respond to the MOU.

87. Plaintiff continued to work on the PEP deliverables as documented in the PEP process.

88. Plaintiff met with Emily Doty to make a formal MOU regarding the fact that   the performance content Defendant Shelton captured to support Ms. Pepe's review was inaccurate and lacked substantive context, and unfairly and negatively rated her.

89. December 5, 2023: Ms. Pepe informed Defendant Shelton Defendant Shelton and Emily Doty via email that she would not be voluntarily stepping down or signing the Reclassification memo sent by Emily Doty.

90. Ms. Pepe informed that in lieu of completing the PEP, she would accept a lateral transfer to another position within Sandia.

91. On December 8, 2023, Lilana sent an email confirming she received my notice that I was not signing the memo to step down on the advice of her attorney. Lilana also captured Ms. Pepe's statement of 'in lieu of completing the PEP, Ms. Pepe would consider a later transfer to another position within Sandia.

92. The email also stated that she would be removing Ms. Pepe as L1 Manager in Department 2963 effective 12/15/23 and that if a position was not secured by Ms. Pepe within the time period of 11/30/23-1/7/24, Ms. Pepe would be given the option to resign or otherwise be separated from the Labs.

93. Defendant Shelton stated that no extension on finding a position elsewhere in the Laboratories would be given.

94. On December 14, Plaintiff requested bereavement leave to attend the funeral of her mother-in-law.

95. Defendant Shelton approved the leave, but told Plaintiff that as the leave was not FMLA, it wouldn't extend the timeline for Plaintiff to find another position or be terminated.

96. On December 13, Defendant Shelton sent an email stating that effective December 15, Haiqing Schwarz would become acting manager of Department 2963, taking over Plaintiff's job responsibilities.

97. From this date forward, Plaintiff's colleagues stopped interacting with her, believing that she had or was about to be fired.  Some told Plaintiff that they had been instructed to leave her alone as she works through her health needs at this time.

98. December 14, 2023, Defendant Shelton cancelled all standing December-January PEP check-in meetings with Ms. Pepe.

99. Plaintiff attempted to seek impartial support from Robert Velasquez in the HR department in hopes he could clarify the communication issues with Emily Doty, but he denied her request.

100.    On January 2, 2024, undersigned counsel sent a letter to Defendants, informing them that they were in violation of law, and that their deadline threatening to fire Ms. Pepe unless she found another position while SNL was closed was unfair and contrary to law.

101.    Defendants extended Plaintiff's deadline to find another position for two additional weeks.

102.    Despite never having agreed to step down or to find another job, Plaintiff's job was taken from her.

103.    Plaintiff began to apply for other positions to avoid losing her career at SNL.

104.    In January 2024, the job posting for Plaintiff's position as s L1 Manager for 2963 was opened, with candidate interviews scheduled to begin on February 20, 2024.

105.    Despite not formally extending her deadline, Defendants still took no action, but continually threatened Plaintiff with impending termination.  She lived in a constant state of panic while she attempted to find other similar positions.

106.    February 2, 2024, had an informal chat with Carl Rhinehart (L2) to discuss options. He indicated it is typical business practice to help relocate an individual rather than separate.

107.    Ms. Pepe informed Rhinehart that she did not qualify for the pension if separated prior to her 55th birthday given she did not have 25 years of service. She only had 23 years. Rhinehart was very surprised to learn that.

108.    In addition to the severity of her anxiety and panic attacks increasing, Plaintiff had begun suffering Syncope (fainting) episodes.

109.    Plaintiff's medical provider ordered a Holter Monitor for her to wear for two weeks to learn more about what was happening.

110.    SNL is a secure facility which prohibits personal electronic devices and a Holter monitor is considered a personal electronic device.

111. Rather than trying to get through the "red tape" to be allowed to bring a personal electronic device onto SNL, Plaintiff asked Defendant Shelton if she could work from home during the time she had to wear the device.

112. Defendant Shelton denied this request.

113. This left Plaintiff with only the option of taking the two weeks off, so she sought and submitted a new FMLA certification for a two-week block of time off, and then to resume her previous intermittent leave thereafter.

114. Plaintiff took February 19-March 4, 2024 off for the duration of the Holter monitoring.

115. March 7, 2024, Plaintiff informed Defendant Shelton that there was a pending request for FMLA in her inbox, which had delayed approval

116. Defendant Shelton responded that she was aware of the request but was "working through the process" for Plaintiff's "FMLA Accommodations"

117. An HR representative named Amy Scott sent an email to Plaintiff on March 7 discussing having an "interactive discussion" regarding Plaintiff's new medical restriction.

118. Neither this email, or the later follow-up email mentioned the ADA and Plaintiff was left believing that her accommodations were under the FMLA.

119. A meeting was held on March 8 with Defendant Shelton, Plaintiff and Scott, likely intended to be part of the interactive process.

120. In addition to requesting to work from home on Fridays when she was otherwise alone in the building, Plaintiff alternatively requested to have a modified work

schedule so that she would no longer have to work on Fridays as she was afraid she might suffer an episode while she was alone.

121. Instead of granting either of her proposed accommodations, the only accommodation Defendants would consider was having Defendant Shelton "check on" Plaintiff throughout the work day to ensure Plaintiff had not had a Syncope episode.

122. This increased Plaintiff's anxiety even further since the relationship between she and Defendant Shelton had deteriorated while Defendant Shelton insisted Plaintiff find a new job.

123. Plaintiff was told that she could only telework if Defendant Shelton was going to be absent.

124. No business reason was given for not allowing Plaintiff to telework on Fridays.

125. Plaintiff was never made aware that Defendant Shelton ever "checked" on her but Defendant Shelton claimed to have checked on Plaintiff so it is unknown whether it ever actually happened

126. It is unclear what effect having someone "check" on Plaintiff would have in keeping her safe if she had already experienced an episode without anyone present and large amounts of time may have elapsed without anyone rendering aid.

127. This proposed "accommodation" made Plaintiff so uncomfortable that she soon entirely withdrew her request for any accommodation at all.

128.    On April 10, 2024 Emily Doty finally responded to Plaintiff's complaint/MOU filed on December 4, 2023, stating that there were no findings. Doty suggested Plaintiff use OMBUDS despite the fact that they cannot help with the issue in question.

129.    April 19, 2024, Plaintiff suffered an anxiety attack and notified Defendant Shelton

that she was going to medical because she worried about being alone.

130.    May 13, 2024: Emily Doty informed Ms. Pepe that since the last job she applied

for 'within the designated timeline, then HR/Defendant Shelton will continue with the

process. HR and Defendant Shelton will move forward with separation of

employment noted in the previous November 2023 memo.

131.    Defendants' hostility to her permeated every aspect of Plaintiff's employment.

132.    Plaintiff felt that she had no other choice but to accept lower paying position with

less responsibilities rather than risk losing her career and pension at SNL, and

accepted one in mid-May 2024.

133.    Plaintiff has consistently been highly rated in her new position.

134.    Plaintiff's new supervisor wanted to give her a bonus for her exemplary work, but

was unable to because of the PEP allegations put in place by Defendant Shelton.

135.    As a result of Defendants' unlawful actions, Plaintiff suffered, and continues to

suffer, damages.


### COUNT I:
### FMLA INTERFERENCE
(All Defendants)


136.    Plaintiff reincorporates and realleges the paragraphs above as though set forth

fully herein.

137.    Defendants are employers under the FMLA and "act, directly or indirectly, in the

interest of an employer to any of the employees of such employer"

138.    Defendant Shelton is an employer under the FMLA and has one or more of the following responsibilities: "the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."

139.    29 C.F.R. § 825.220 "An employer is prohibited from interfering with, restraining, or denying the exercise of (or attempts to exercise) any rights provided by the Act."

140.    29 C.F.R. § 825.300(b)(1) requires "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days…. Employee eligibility is determined (and notice must be provided) at the commencement of the first instance of leave for each FMLA-qualifying reason in the applicable 12-month period."

141.    Defendant Shelton had direct knowledge of Plaintiff's FMLA qualifying condition on or before August 17, 2023 but failed to give Plaintiff notice of her rights or provide any FMLA forms to her.

142.    Defendant Shelton had direct knowledge of Plaintiff's FMLA qualifying condition on September 14, 2023 when Plaintiff reported to the medical facility for chest pain and rapid breathing.

143.    Defendants Defendant Shelton failed to notify Plaintiff of her FMLA rights on September 14, 2023, which constitutes unlawful interference.

144.    Defendants interfered with Plaintiff FMLA when they put her on an arduous PEP which would discourage her from taking time off or risk not meeting the PEP requirements.

145.    Defendants interfered with Plaintiff's FMLA when they insisted that Plaintiff had to leave her current job; find a new position or be terminated.

146.    Defendants interfered with Plaintiff's FMLA when they conflated FMLA with an accommodations process, leading Plaintiff to believe that her accommodations request to work from home or for an alternate schedule arose under the FMLA.

147.    Plaintiff suffered damages from Defendants' unlawful interference because she was not notified of her FMLA rights within 5 days as required by law, and did not take leave she was otherwise entitled to.

148.    Plaintiff suffered damages from Defendants' unlawful interference because she did not take leave she was otherwise entitled to after she was certified, for fear of not meeting the PEP requirements.

149.    Plaintiff suffered damages from Defendants' unlawful interference because she had no other choice but to take a lower paying job or be terminated.

150.    The job she had no choice but to accept was lower paying than the one she already had, and had less responsibilities and respect.

151.    As a direct or proximate result of Defendants unlawful actions, Plaintiff suffered, and continues to suffer, damages.

## **COUNT II:**
## **FMLA RETALIATION**
### (All Defendants)

152. Plaintiff reincorporates and realleges the paragraphs above as though set forth fully herein.

153. Defendants are employers under the FMLA and "act, directly or indirectly, in the interest of an employer to any of the employees of such employer"

154. Defendant Shelton is an employer under the FMLA and has one or more of the following responsibilities: "the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records."

155. 29 U.S.C.S. § 2615 "It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this title."

156. Only two weeks after Plaintiff was notified of her rights and approved for FMLA, Defendants retaliated against Plaintiff when they unilaterally began insisting she leave her job or be terminated.

157. Defendants attempted to coerce Plaintiff into signing a letter agreeing to step down from management, despite the fact she informed them she did not want to.

158. When Plaintiff would not agree to step down, Defendants told Plaintiff she had to either immediately find another position or be terminated.

159. Defendants had no lawful grounds to terminate Plaintiff's employment.

160. Defendants' deadline to find another position fell over the December holidays, when SNL shuts down for 2 weeks.

161. Defendants knew that it would be nearly impossible for Plaintiff to find another position when SNL was closed.

162. Defendants retaliated against Plaintiff by placing her on an arduous PEP after they knew she had an FMLA qualifying condition, and waited more than 2 weeks to finally notify Plaintiff of her rights.

163. Defendants demoted Plaintiff, assigned an acting manager to her responsibilities and posted her position to hire a new manager for her job role.

164. Defendants retaliated against Plaintiff by continuing to threaten to fire her, until Plaintiff was desperate enough to accept a demotion rather than face termination.

165. Plaintiff suffered damages from Defendants unlawful retaliation because the job she had no choice but to accept was lower paying than the one she held, and had less responsibilities and respect.

166. Even after Plaintiff had no choice but to accept a demotion, Defendants attempted to get Plaintiff to sign a memo stating she had willingly left her position, rather than doing so under threat of termination.

167. As a direct or proximate result of Defendants unlawful actions, Plaintiff suffered, and continues to suffer, damages.

## COUNT III:
## VIOLATION OF THE ADA
(Defendant SNL)

168. Plaintiff reincorporates and realleges the paragraphs above as though set forth fully herein.

169. Plaintiff suffers from a mixed anxiety and depression disorder.

170.    This condition qualifies as a life affecting disability under the ADA.

171.    Plaintiff was qualified for the Design Engineering position she held.

172.    Plaintiff informed her manager, Defendant Shelton Defendant Shelton that her work environment was triggering her disability, which was affecting her ability to perform the essential functions of her position.

173.    After Plaintiff's disability was disclosed, Defendants began to take adverse actions against Plaintiff.

174.    Defendants did not engage in the interactive process with Plaintiff and did not offer any accommodations when they learned of her disability.

175.    Instead, Defendant Shelton instructed Plaintiff to "get over" her disability.

176.    Defendants discriminated against Plaintiff by failing to accommodate her and by negatively reviewing her unaccommodated job performance.

177.    Plaintiff requested the accommodation of being given preparation time and notice before meetings, particularly in high stress situations, but Defendants failed to accommodate her.

178.    Defendants discriminated against Plaintiff when they abruptly cancelled her scheduled and approved training and forced her to immediately travel back to Albuquerque.

179.    Defendants discriminated against Plaintiff by pressuring her to take a demotion or to quit her job altogether.

180.    Defendants repeatedly gave Plaintiff deadlines by which she had to leave her position or be fired.

181.    Defendants failed to reasonably accommodate Plaintiff by allowing her to telework on Fridays, and insisting that having Defendant Shelton "check" on Plaintiff was an adequate accommodation.

182.    Placing Plaintiff under increased scrutiny because of her disability is an act of discrimination.

183.    Defendants knowingly caused Plaintiff to suffer severe anxiety and panic attacks as a direct result of their constant threats to terminate her.

184.    Defendants removing Plaintiff's management responsibilities without any process and assigning a new acting manager discriminated against Plaintiff because of her disability.

185.    Defendants posting Plaintiff's job position while Plaintiff was actually employed at Design Engineering caused her to suffer extreme humiliation, anxiety and panic attacks.

186.    Defendants' threats to terminate Plaintiff created a hostile work environment which gave Plaintiff no other choice but to take a demotion to a position with less pay, less responsibility and less respect.

187.    Defendants ongoing failure to properly accommodate Plaintiff created a hostile work environment based on her disability.

188.    As a direct or proximate result of Defendants unlawful actions, Plaintiff suffered, and continues to suffer, damages.

## **PRAYER FOR RELIEF**

1.  Ms. Pepe respectfully requests:

a.  A trial by jury on all issues so triable;

b.  Judgement against Defendant;

c.  Compensatory Damages;

d.  Statutory Damages;

e.  Punitive Damages;

f.  Any other damages available to Plaintiff;

g.  Attorney's fees and costs;

h.  Pre and post judgement interest;

i.  Any other relief as may be deemed just and equitable.

Respectfully Submitted.

Heather Burke
Attorney at Law
1000 Cordova Place #24
Santa Fe, NM 87505
(505) 428-9424
heather@hburkelaw.com