**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

**CYNTHIA PEPE,**

**Plaintiff**

**v.** **No. 1:25-cv-00537-GJF-LF**

**NATIONAL TECHNOLOGY AND ENGINEERING SOLUTIONS OF SANDIA, LLC, dba SANDIA NATIONAL LABORATORIES, and LILIANA SHELTON, in her official and individual capacities,**

**Defendants.**

# MEMORANDUM OPINION AND ORDER

In this employment case, Plaintiff Cynthia Pepe alleges that her employer, Defendant National Technology and Engineering Solutions of Sandia, LLC, dba Sandia National Laboratories, and supervisor, Defendant Liliana Shelton, violated the Family and Medical Leave Act ("FMLA") and Americans with Disabilities Act ("ADA"). Defendants filed a Motion for Summary Judgment (Dkt. No. 94) on all claims. Following the submission of the response and reply, Plaintiff filed an Opposed Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 143) and an amended Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 144). Defendants opposed the motion and asked the Court both to deny the request to file the surreply and to strike it from the record. Defs.' Resp., Dkt. No. 147. For the reasons discussed herein, the Court will permit Plaintiff to file the surreply. Nonetheless, after having considered the motion, response, reply, and surreply, as well as the evidence and applicable law, the Court will grant Defendants' Motion for Summary Judgment.

## I. MOTION TO FILE SURREPLY

As an initial matter, the Court will deny as moot Plaintiff's Opposed Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 143) and instead consider the arguments set forth in the amended Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment (Dkt. No. 144). Plaintiff insists therein that Defendants' reply contains new affirmative legal arguments that go beyond rebuttal of the positions Plaintiff advanced in her response. Plaintiff points to three arguments in Defendants' reply. First, Defendants asserted that, if they had treated Plaintiff as unable to work and placed her on unrequested leave, they could have faced liability under the ADA's "regarded as" prong. Defs.' Reply 17-18, Dkt. No. 117. Second, Defendants contended that Plaintiff's September 14, 2023, email constituted an affirmative representation that she did not require accommodation. *Id.* at 17. Third, Defendants emphasized that Plaintiffs' FMLA arguments rest on contradictory premises. *Id.* at 13. Plaintiff seeks an opportunity to address the new legal arguments. Pl.'s Mot. 3, Dkt. No. 144. For their part, Defendants argue the motion should be denied because it was improperly and prematurely filed.

"The filing of a surreply requires leave of the Court." D.N.M. Local Rule 7.4(b). A court should generally permit a party to file a surreply if the other party raises new evidence or new legal arguments in the reply. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). The Court is not convinced that the arguments Plaintiff seeks to address were new, rather than responsive arguments pointing out the purported defects in Plaintiff's brief in opposition. Nevertheless, in an abundance of caution, the Court will consider the arguments in the surreply to ensure it has fully

considered the record before entering summary judgment. The Court will therefore grant Plaintiff's motion to file a surreply.[1]

## II. MOTION FOR SUMMARY JUDGMENT

### A. FACTUAL BACKGROUND[2]

Plaintiff's Employment with Sandia

Defendant National Technology and Engineering Solutions of Sandia, LLC, dba Sandia National Laboratories ("NTESS" or "Sandia") employed Plaintiff from February 2001 until her retirement on April 14, 2026. Defs.' Mot. for Summ. J. ("MSJ"), Undisputed Fact ("UF")[3] ¶ 1, Dkt. No. 94. On May 8, 2020, she became a Level 1 Manager in Sandia's Design Engineering Organization and supervisor of 16-23 employees. *Id.*, UF ¶¶ 2-3.[4] Kelly Neely, who was Plaintiff's

---

[1] For similar reasons, the Court declines Defendants' request to strike pages 24-28 of Plaintiffs' response despite exceeding the 24-page length set forth in D.N.M. Local Civil Rule 7.5. *See* Defs.' Reply 1 n.1, Dkt. No. 117. The Court will also consider the exhibits attached to Plaintiffs' response, even purported native versions of emails Plaintiff may have attached without Defendants' prior consent, which Defendants argue violates the Court's April 8, 2026, Order. Again, the Court will review cited evidence to ensure its decision does not hinge on technical defects rather than the merits. Defendants have other remedies available to them to enforce the April 8, 2026, Order, should they choose to pursue them.

[2] The following facts are those viewed in the light most favorable to Plaintiff, the non-moving party. Where the parties dispute the characterization of a document, the Court at times has quoted directly from the source. Where a party denies a fact without any citation to supporting evidence, the Court deems it an improper denial and views the fact as undisputed. The Court has not included as facts arguments of counsel or speculation bereft of evidentiary factual support. *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1061 (10th Cir. 2009) (explaining that arguments of counsel and conjecture are not evidence to properly refute a motion for summary judgment). Finally, in their motion, Defendants set out 57 enumerated paragraphs of purported undisputed material facts. Defs.' Mot. for Summ. J. 2-11, Dkt. No. 94. Plaintiff responded to each enumerated paragraph, but beginning in her response to paragraph 25, she appears to dispute both paragraphs 25 and 26 within paragraph 25, resulting thereafter in Plaintiff's numbering being off by one. *See* Pl.'s Resp. 4-5, Dkt. No. 108. *See also* Defs.' Reply 15, n.4, Dkt. No. 117. The Court has construed Plaintiff's responses to Defendants' factual paragraphs 25-57 by considering the intended correct numbering.

[3] Herein, an "Undisputed Fact" is a fact Plaintiff admitted in her response or that Defendants admitted in their reply.

[4] Sometime in 2020 to 2021, Plaintiff experienced what she perceived as a hostile work environment from a co-manager named Jason Gale. *See* Pepe Decl. ¶ 9, Dkt. No. 108-1; Defs.' Ex. 23, Dkt. No. 94-23. After she reported it, he was moved to another organization but continued sending emails "reporting" her to management. Pepe Decl. ¶¶ 10-11, Dkt. No. 108-1. Plaintiff had a difficult time getting past the effect his actions had on her. *Id.* ¶ 12. Defendants contend the facts regarding Jason Gale do not create a genuine issue of material fact because they are immaterial. *See* Defs.' Reply 2-4, Dkt. No. 117. These events pre-dated the relevant timeframe. The Court agrees this evidence is irrelevant to the issues pertinent to the motion for summary judgment.

manager for about 1.5 years, completed Plaintiff's 2022 performance review. *See* Pepe Decl. ¶ 14, Dkt. No. 108-1; Rhinehart Dep. 43:1-44:11, Dkt. No. 108-8.

As an employee, Plaintiff could access Sandia's internal website with its policies and procedures. MSJ, UF ¶ 4, Dkt. No. 94. Plaintiff used leave under the FMLA on prior occasions for injuries and surgeries, and she knew how to request it. *See* Pepe Dep. 20:1-21:25, Dkt. No. 94-1. As a manager, she assisted an employee with an eye injury in getting FMLA leave. *See* Pepe Dep. 22:1-21, Dkt. No. 94-1. She did not know, however, that anxiety could be covered under the FMLA. Pepe Decl. ¶ 4, Dkt. No. 108-1.

Carl Rhinehart's Management of Plaintiff

Carl Rhinehart ("Rhinehart") was Plaintiff's Level 2 manager for approximately seven months from October 2022 to May 2023. *See* Pepe Dep. 61:20-62:1, Dkt. No. 94-1; Pepe Decl. ¶ 15, Dkt. No. 108-1. Kelly Neely verbally made Rhinehart aware of prior performance challenges with Plaintiff. Rhinehart Dep. 44:7-44:25, Dkt. No. 108-8. As Plaintiff's manager, Rhinehart gave Plaintiff input about her performance in one-on-one discussions and in emails. Pepe Dep. 62:2-8, Dkt. No. 94-1. Although he offered her objective feedback and even clarity in some of his email communications, *see id.* 68:1-7, he never gave Plaintiff an interim or annual performance evaluation. Pepe Decl. ¶¶ 16-17, Dkt. No. 108-1.

Sandia has a progressive discipline policy. *See* Pl.'s Ex. 20 at 129:9-22, Dkt. No. 108-19; Def.'s Ex. 10, Dkt. No. 94-10. According to that policy, an employee whose performance does not meet expectations will be placed in the "performance improvement process." Defs.' Ex. 10, Dkt. No. 94-10 at 1 of 15. The policy guides informal actions. *Id.* at 2 of 15. The manager identifies performance issues or deficiencies and meets with the employee to discuss them before they become serious enough to move to formal actions. *See id.* During the discussion, the manager

should precisely list the performance and/or behavior expectations, explain how the employee is failing to meet them, and discuss the steps the employee can take to meet expectations. *Id.* at 3 of 15. The manager and employee should create "an informal action/memo of expectations that states how and when the manager will follow up" and the employee's consequences for failure to improve. *See id.* at 2-3 of 15. Informal actions may take the form of emails or written documentation to the employee that describes expectations, and the next step is a Management of Expectations ("MOE"). Rhinehart Dep. 16:10-17, Dkt. No. 108-10. The informal action plan/MOE may be an email that sets out expectations for the employee, including due dates, as needed, with an explanation for the employee to follow up with the manager. *See id.* at 16:10-17:12. If "the employee's performance does not improve to the level required to meet expectations," the manager "proceed[s] to the 'Initiate Formal Actions' section of this process," the next step of which is a Performance Expectation Plan ("PEP"). Defs.' Ex. 10, Dkt. No. 94-10 at 4-6 of 15.

In or around January 2023, Plaintiff had a broken toe that made it difficult for her to come into the office, so she worked from home more than usual. Pepe Decl. ¶ 8, Dkt. No. 108-1. On January 19, 2023, Rhinehart emailed Plaintiff: "I've received feedback as recent as yesterday from your staff about your lack of attendance in the office and responsiveness to emails and requests." Defs.' Ex. 4, Dkt. No. 94-4. Plaintiff replied that she was working from home due to a toe broken during the time frame of January 3-5, 2023. *Id.* Rhinehart then clarified, "Not just the past week or two, I'm referring to the current fiscal year for context." *Id.*

On April 24, 2023, Plaintiff sent Rhinehart an email outlining her past and upcoming efforts to make a training budget request. *See* Defs.' Ex. 5, Dkt. No. 94-5.[5] The next day Rhinehart

[5] Plaintiff disputes this fact, but not with contrary admissible evidence. Instead, she argues that Exhibit 5 cannot be used in evidence in support of Defendants' MSJ or at trial because it is only a portion of the email chain and Defendants did not produce the complete chain in native form. Pl.'s Resp. 2, ¶ 9, Dkt. No. 108. Plaintiff objects "to a foundational evidentiary problem" arising from Defendants' purported failure to produce all non-privileged emails in native format

responded: "To be more direct, please stop working on this activity to create a DE budget for training. Cancel any meetings and stop all communications on this topic. I need you to focus on the priorities as outlined." *Id.*

On May 1, 2023, Rhinehart emailed Plaintiff the following:

> Just want to follow-up so the message is very clear where you currently stand on performance and behaviors.
>
> The message was not communicated to you from your previous manager, but you were going to receive a lower elbow rating for the FY22 performance period. I've mentioned to you previously that [the] only reason it didn't occur was due to lack of documentation and engagement.
>
> You started the FY23 performance period needing significant improvement in performance and behaviors. As of today, your behaviors have improved tremendously. I'm still not seeing much improvement on the performance. You continue to have challenges finishing tasks that you start. I've been trying my best to help you by keeping you focused on the real priorities….
>
> We are at the mid-year so there's still time left to adjust. You have to help me help you. At the moment, you are making that very difficult.

Defs.' Ex. 6, Dkt. No. 94-6. When Rhinehart said there was still time to adjust, he meant that Plaintiff still had an opportunity to improve her performance before she would move from informal to formal processes. *See* Rhinehart Dep. 34:11-37:14, Dkt. No. 108-11. At this point, he considered them to be in the informal process stage. *Id.*

He also addressed miscommunications between Plaintiff and him in an email sent May 9, 2023. Defs.' Ex. 7, Dkt. No. 94-7; Pl.'s P-2, Dkt. No. 108-2. He set forth a list of "[e]xpectations for major changes," but he also noted that the clarifying statements were not about who was right

with metadata preserved. Pl.'s Resp. 15-16, Dkt. No. 108. Defendants, however, submitted the Declaration of Michelle Chavez in which she stated under oath that Exhibits 4-26 are true and correct copies of business records maintained in the ordinary course of business. Chavez Decl. ¶ 3, Dkt. No. 94-3. Defendants properly authenticated Exhibits 4-26. The Court overrules Plaintiff's objections in her response that are based on whether the document was produced in native form. *See* Pl.'s Resp. 2, 4-7, ¶¶ 9-11, 25-26, 29, 31-32, Dkt. No. 108 (making similar objections to Exhibits 5, 6, 14, 15, 19, and 23). Consequently, at this stage, the Court will consider Exhibits 5, 6, 14, 15, 19, and 23.

or wrong but to get into alignment. *Id.* Plaintiff responded by agreeing "with improving our communication" and ensuring that "approval" is a more intentional/formal approach. Pl.'s Ex. 2, Dkt. No. 108-2.

<u>Liliana Shelton's Management of Plaintiff</u>

In mid-May 2023, Liliana Shelton became Plaintiff's manager. Pepe Decl. ¶ 19, Dkt. No. 108-1. Within days of Defendant Shelton starting her new position, Rhinehart told her that Plaintiff was "a daily chore." Pl.'s Ex. 9, Dkt. No. 108-9.

By email dated August 30, 2023, Defendant Shelton informed Plaintiff:

> I do want to communicate to you that this has been a frustrating discussion due to the lack of communication and coordination with me on this approval and the wrong information being provided …, making decisions becomes very difficult when I don't have all the information, or the information I have is not correct. The details really matter in these situations, and it's ok to take time to get the right information, instead of just providing information if you are not sure of it.

Defs.' Ex. 8, Dkt. No. 94-8. Plaintiff understood the email to be Defendant Shelton's expectation to improve communication with her. Defs.' UF ¶ 14, Dkt. No. 94.

On September 14, 2023, Plaintiff went to Sandia's onsite health center for emergency treatment for symptoms that were diagnosed as a massive panic attack. *See* Pepe Decl. ¶¶ 22-24, Dkt. No. 108-1. During the several hours she was there, she did not work. *Id.* Sandia has a policy that an employee does not need to use time off when utilizing the onsite health center. *Id.* ¶ 24. That same day, Plaintiff emailed Defendant Shelton, among others, explaining that she had a "panic attack that had some chest pain associated with it" but that she felt "confident this was simply a result of how I internalized recent stress." Defs.' Ex. 24, Dkt. No. 94-24. She noted that this was "not typical," but she had "a heck of a last week with a dog bite and was re[ar]-ended and pushed into an intersection." *Id.* She notified them that she was working from home. *Id.* Because

of the pressure at work, Plaintiff did not want to take leave to avoid adverse consequences, so she worked from home. Pepe Decl. ¶ 25, Dkt. No. 108-1.

That same month, Defendant Shelton prepared Plaintiff's performance evaluation. *See* MSJ, UF ¶ 15, Dkt. No. 94. On September 18, 2023, Defendant Shelton rated her "below expectations." *See id.*; Defs.' Ex. 9, Dkt. No. 94-9 at 9 of 14. Approximately six hours later, Lani Sanders forwarded to Defendant Shelton emails between Plaintiff and Rhinehart from April 24, 2023, and May 1, 2023. *See* Defs.' Ex. 30, Dkt. No. 117-5; Pl.'s Ex. 13, Dkt. No. 108-12. Two days later, Defendant Shelton gave an overall block 9 "below expectations" rating for Plaintiff's behaviors. Pl.'s UF ¶ 26, Dkt. No. 108.

In support of her evaluation, Defendant Shelton set out the contents of Rhinehart's May 1, 2023, email. Defs.' Ex. 9, Dkt. No. 94-9 at 9-11 of 14. She, however, did not look at the prior 2022 performance review to verify the contents of Rhinehart's email. *See* Shelton Dep. 46:9-48:18, Dkt. No. 108-18. She further reported in the performance review: "During the remainder of the year, there have been numerous examples of additional churn caused by activities that [Plaintiff] takes up on her own without coordination, sometimes creating additional work for others." Defs.' Ex. 9, Dkt. No. 94-9 at 11 of 14. She then gave "examples of situations that have been handled with poor judgement for a L1 manager," *id.*, including an incident where she "interacted with staff in a disrespectful manner," *id.* at 12 of 14. Defendant Shelton also relayed that there was "a significant amount of organizational risk" incurred by mishandling procurement issues. *See id.* On September 26, 2023, Defendant Shelton entered nine ratings into the performance review. *See* Pl.'s UF ¶¶ 27-28, Dkt. No. 108.[6]

[6] Plaintiff disputes the contents of the performance review, not with contrary admissible evidence, but because Defendants do not refer to the record with specificity. *See* Pl.'s Resp. 3, ¶ 16, Dkt. No. 108. Defendants, however, cited to Exhibit 9, a 14-page document, and highlighted those portions to which they referred. While page citations may have been more helpful, the Court had no difficulty finding the portions of the record cited by Defendants.

On October 26, 2023, Defendant Shelton delivered the Performance Evaluation to Plaintiff with Emily Doty from Human Resources ("HR") appearing by phone. Defs.' UF ¶ 18, Dkt. No. 94; Pl.'s UF ¶ 29, Dkt. No. 108. Prior to October 26, 2023, Plaintiff had never had a poor performance review. Pepe Decl. ¶ 7, Dkt. No. 108-1.[7] Plaintiff e-signed the document, although her signature "does not necessarily mean that the employee agrees with the review, it simply affirms that the manager discussed the results in detail with the employee." Defs.' Ex. 9, Dkt. No. 94-9 at 13 of 14. Plaintiff wrote the following optional comments:

> I have read the evaluation summary and met with Liliana in person regarding the items listed. The information is actionable, and I will be working closely with my leadership, peers and staff to correct course. My opportunity to make correction is intended as sustained improvement to allow for continued development and growth beyond the areas listed above.

*Id.*

Defendants placed Plaintiff on a Performance Expectation Plan ("PEP") from October 20, 2023, to January 6, 2024. Defs.' Ex. 11, Dkt. No. 94-11. Defendants also sent Plaintiff a memo dated October 26, 2023, regarding her placement on the PEP. Defs.' Ex. 12, Dkt. No. 94-12. The memo notified her that she was given a paid one-day, decision-making day off on October 30, 2023, to consider whether she was willing to commit to the performance expectations set forth in the PEP and to creating her own written action plan on how to meet those expectations. Defs.' Ex. 12, Dkt. No. 94-12. When they presented Plaintiff with the PEP, Defendants gave her four options:

---

Because the Court overrules Plaintiff's specificity objection and Plaintiff failed to counter the fact with admissible, contrary evidence, the Court will consider the contents of Exhibit 9.

[7] In response to this purported fact, Defendants state: "This contention does not create a genuine dispute of material fact because it is immaterial, is self-serving and unsupported, and is based on Plaintiff's subjective and undefined belief of what constitutes a 'poor review.'" Defs.' Reply 3, ¶ 1, Dkt. No. 117. Defendants make similar arguments to many of the facts Plaintiff supports with her Declaration. Plaintiff's Declaration, however, is admissible evidence, even if it is self-serving, so long as it is based on her personal knowledge, sets out facts that would be admissible, and shows she is competent to testify on the matters stated. *See* Fed. R. Civ. P. 56(c)(4). The Court will thus consider this evidence.

(1) accept the PEP and create an action plan; (2) resign; (3) go immediately to a Corporate Review Committee where three Directors would evaluate the decision to place her on a PEP, and should they agree with the appropriateness of the decision, end her employment; or (4) voluntarily step down with management approval and search for a new position at Sandia. Defs.' UF ¶ 20, Dkt. No. 94. These four options were set forth in Sandia's policy regarding Formal Actions. Defs.' Ex. 10, Dkt. No. 94-10 at 10-11 of 15. The PEP required Plaintiff to take training. Pepe Dep. 120:4-121:6, Dkt. No. 94-1.

Plaintiff was scheduled to be off work on October 27, 2023. *See* Pepe Decl. ¶¶ 28-30, Dkt. No. 108-1. She travelled to Las Vegas the following week for a NWMOC training, based on pre-approved travel authorization by Defendant Shelton, but was forced to come back early. Pepe Decl. ¶¶ 29, 31, Dkt. No. 108-1; Pepe Dep. 120:7-12, Dkt. No. 94-1. On October 31, 2023, Plaintiff submitted an action plan. Defs.' Ex. 13, Dkt. No. 94-13. *Compare* MSJ 6, ¶ 22, Dkt. No. 94, *with* Pl.'s Resp. 4, ¶ 22, Dkt. No. 108. Before this, Plaintiff had never been expected to make a PEP action plan and had received no training on the subject. Pepe Decl. ¶ 32, Dkt. No. 108-1.

Defendant Shelton notified Plaintiff that she considered Plaintiff's action plan insufficient because it did not contain deliverable dates or prioritization of activities and milestones against which to evaluate her. Defs.' Ex. 13, Dkt. No. 94. Defendant Shelton did not intend to help Plaintiff improve her actions plans, nor did anyone reach out to help her create the action plan. *See* Pl.'s Ex. 14, Dkt. No. 108-13; Shelton Dep. 118:20-120:3, Dkt. No. 108-14; Pepe Decl. ¶ 33, Dkt. No. 108-1. On November 9, 2023, HR emailed Defendant Shelton regarding "following up to confirm the next step if a Manager is given the option by CRC to step down after a failed APIP," and setting forth a portion of Sandia's policy regarding HR015.1 Implement the Performance Improvement Process. Pl.'s Ex. 16, Dkt. No. 108-15.

Plaintiff met with Defendant Shelton more than once for check-in meetings in which Defendant Shelton gave her feedback on how she was doing on the PEP. *See* Pepe Dep. 118:4-120:3, Dkt. No. 94-1. Defendant Shelton, however, did not always follow her own guidelines in providing feedback in a timely manner, as she took vacation and was at times unavailable and unreachable during the PEP timeframe. *See id.* at 118:19-119:17. Defendant Shelton met with Plaintiff, and later in the day she sent Plaintiff an email dated November 14, 2023, to document their discussion. Defs.' Ex. 14, Dkt. No. 94-14. According to the email, Plaintiff did not demonstrate improvement for the week. *Id.* Shelton listed detailed comments in multiple performance areas for what did not go well that week. *See id.*

On and around November 15, 2023, Plaintiff was suffering severe anxiety attacks and was afraid she would fail the PEP and lose her career at Sandia. *See* Pepe Decl. ¶ 34, Dkt. No. 108-1. Defendant Shelton followed up with an email to Plaintiff dated November 15, 2023, which said: "You mentioned that you are continuing to work with the EAP, and I just want to encourage you to continue working with them and focusing on your wellbeing through this process. This would include any protected leave time that you may qualify for." Defs.' Ex. 15, Dkt. No. 94-15 at 2 of 3.[8] Plaintiff replied by email dated November 15, 2023, that she had a "doctor's appointment today to follow-up on FMLA." Defs.' Ex. 15, Dkt. No. 94-15 at 1. She explained that she "realized this position is not serving me at this time" and asked whether there was an "opportunity for [her] to step down from management." *Id.*, Dkt. No. 94-15 at 1-2 of 3. She visited her healthcare provider that day for her anxiety/panic attacks and to get her FMLA paperwork filled out. *See* Defs.' Ex.

[8] Plaintiff asserts that Defendants cannot rely on Exhibit 15 as evidence in their motion or at trial because they failed to produce the email in native form by April 14, 2026. Pl.'s Resp. 5, ¶ 25, Dkt. No. 108. As noted in footnote 5, *supra*, Defendants properly authenticated the email, and the Court rejects Plaintiff's argument that the Court should not consider it because Defendants did not produce the version in native form.

16, Dkt. No. 94-16. She told her provider that she "is currently trying to switch positions at work to help relieve some of the anxiety." *Id.*

On November 16, 2023, Defendant Shelton responded to Plaintiff's email:

> I understand and support your decision to step down from management….
>
> Here are the steps we are taking to support you in that decision. We are looking to see if we can identify a position that would allow you to step down immediately. I would encourage you to start looking at other options for yourself as it is your responsibility to find an individual contributor role. We will have a recap meeting the week after Thanksgiving to provide an option and additional information.

Defs.' Ex. 15, Dkt. No. 94-15 at 1 of 3; Pl.'s Ex. 18, Dkt. No. 108-17. The same day, Plaintiff told her daughter in an email that "my leadership has agreed to me stepping out" and that she was trying to look into the details for a follow-up discussion. Defs.' Ex. 18, Dkt. No. 94-18.

Plaintiff had discussed her mental health and anxiety issues with Defendant Shelton in several meetings after she became her manager. Pepe Decl. ¶ 20, Dkt. No. 108-1. Prior to November 15, 2023, Defendant Shelton never suggested that her anxiety might qualify for FMLA leave. *See id.* ¶ 21.

Plaintiff received FMLA leave on November 15, 2023, and thereafter she was given the leave she needed and was never denied leave. Pepe Dep. 149:5-8, Dkt. No. 94-1; Pepe Decl. ¶ 3, Dkt. No. 108-1. She would have used FMLA leave prior to November 15, 2023, however, had she been notified that her anxiety disorder may qualify. Pepe Decl. ¶ 5, Dkt. No. 108-1. On or around this time, Plaintiff requested intermittent absences as a work accommodation, a request Defendants granted. *See* Defs.' Ex. 27, Dkt. No. 94-27.

Emily Doty emailed Plaintiff on November 21, 2023, stating that she "would like to schedule a meeting [] to discuss your self selection to step down from your leadership role." Defs.' Ex. 19, Dkt. No. 94-19. She conveyed her "understanding that the HRBP [Human Resources

Business Partner] is working towards identifying a potential position for" her but advised her to "continue to review any positions you may qualify for." *Id.*; Defs.' MSJ, ¶ 32, Dkt. No. 94. Plaintiff replied, "Thank you for the response. Talk soon." Defs.' Ex. 19, Dkt. No. 94-19.

On November 29, 2023, Plaintiff emailed Defendant Shelton to ask if a budgeted position could transfer with her to a new position, which was "key in identifying [a] staff-level job opportunity." Defs.' Ex. 20, Dkt. No. 94-20. Defendant Shelton responded that Lani was willing to come down one head count if that would help her secure another position. *Id.* However, Lani Sanders did not reduce her head count to make it easier for Plaintiff to find another position. Pepe Decl. ¶ 41, Dkt. No. 108-1.

At this time, Plaintiff was still trying to evaluate the best career path and had not intended to make any agreement. Pepe Decl. ¶ 43, Dkt. No. 108-1. Around November 30, 2023, Defendant Shelton and Ms. Doty wanted Plaintiff to sign an agreement stating that she was agreeing to step down and that she would need to find her own position in the next 30 days or lose her job. *Id.* ¶ 42. They presented Plaintiff with a "Reclassification Memo" that Plaintiff refused to sign. *See* Pepe Dep. 14:6-16, Dkt. No. 94-1, & 140:4-141:3, Dkt. No. 117-1.

Plaintiff then emailed Defendant Shelton and Emily Davis asking about how her FMLA leave would affect the timeframes for finding another job:

> Prior to joining today's meeting I did tell Liliana I couldn't attend but she directed me to attend.
>
> The reason is due to preparation for high stress situations, not difficult conversations, and ensuring I am prepared with potential questions.
>
> For your awareness Emily, Liliana is aware of my anxiety and we have had several discussions regarding it and its impact. In fact, when I discussed stepping down the conversation was regarding her being a champion of my wellness.
>
> One question I was not prepared to ask during was about the time limit specified and the impact of FMLA.

> Please let me know how or if use of FMLA during this 37 day timeline is factored in or it is not a consideration. I cannot predict the need but can inform you I will be using some time today.

Pl.'s Ex. 6, Dkt. No. 108-6; Defs.' UF ¶ 37, Dkt. No. 94.

On December 4, 2023, Plaintiff sent to Defendant Shelton and Ms. Doty a "Memo of Understanding—Reclassification: Voluntary Step Down vs. Complete PEP" dated December 2, 2023. Defs.' Ex. 23, Dkt. No. 94-23; Pl.'s Ex. 4, Dkt. No. 108-4 at 2 of 3.[9] She explained:

> The purpose of this memo is to document my decision process to step down from my role as a Manager-R&D, Sciences and Engineering Level 1 Management and seek alternative position as an independent contributor role. It is clear to me from the meeting held on Thursday, November 30, 2023, there is a disconnect in the reasons *why I was considering* changing from the PEP to voluntarily stepping down from management to an individual contributor.

Defs.' Ex. 23, Dkt. No. 94-3 at 1 of 3 (emphasis added). She requested 67 days "to find an alternative position as an independent contributor role" and expressed concerns that "finding an alternative position will be negatively impacted when references are sought." *Id.* at 3 of 3. She asked for assurance that she will "have an honest opportunity," noting that that the "environment, not the L1 job, is what has created a high level of anxiety" and that she anticipated "movement out of DE will only be beneficial." *Id.*

Plaintiff received extensions of time to continue applying for alternative positions at Sandia. *See* Defs.' Ex. 26, Dkt. No. 94-26; Pepe Dep. 150:3-151:8, Dkt. No. 94-1. Adjustments were made due to her FMLA leave. *See* Defs.' Ex. 26, Dkt. No. 94-26; Pl.'s Ex. 5, Dkt. No. 108-

[9] Plaintiff disputes the timeline regarding when the memo was sent and received. *See* Pl.'s Resp. 7, ¶ 37, Dkt. No. 108. She also objects that Defendants failed to produce the email containing this document or any responses to it in native format. *Id.* ¶¶ 37-38. Plaintiff, however, also acknowledges that she "may have written the memo on her own time on December 2, 2023, which was a Saturday." *Id.* ¶ 37. As this Court noted *supra*, Defendants properly authenticated this document as a business record. Plaintiff admits writing the memo. That Defendant did not produce the email containing the document or responses in native format is not grounds for failing to consider the contents of the memo Plaintiff wrote. Moreover, Defendants have since produced the document. *See* Pl.'s Reply 4-5, Dkt. No. 124-1. The Court will therefore consider Exhibit 23.

5. On January 29, 2024, Ms. Doty imposed a new deadline of January 31, 2024, and warned: "You may continue to apply to open positions until that date. After that date, if you are not able to secure a position from those that you have applied to within that time period, your employment will be separated." Pl.'s Ex. 5, Dkt. No. 108-5.

Plaintiff's Position Change and Retirement

Plaintiff never agreed to resign from her management position. Pepe Decl. ¶ 45, Dkt. No. 108-1. On December 15, 2023, Defendant Shelton changed Plaintiff's position to a specially created position. *See id.*; Pepe Dep. 14:6-15:15, Dkt. No. 94-1. Plaintiff's pay remained the same, but she was no longer supervising any employees. *See* Pepe Dep. 14:6-16:6, Dkt. No. 94-1; Pepe Decl. ¶ 45, Dkt. No. 108-1; MSJ 9, ¶ 40, Dkt. No. 94; Pl.'s Resp. 7, ¶ 39 ("Plaintiff was demoted by Defendant Shelton but her pay remained the same.").

On June 1, 2024, Plaintiff found another position at Sandia, a demotion in pay, duties, and prestige, but she accepted it rather than risk losing her career through termination. *See* Pepe Dep. 14:17-23, Dkt. No. 94-1; Pepe Decl. ¶ 47, 50, Dkt. No. 108-1. Because of the stress of encountering people who she believed discriminated against her, Plaintiff retired from Sandia effective April 14, 2026. *See* Tedder Decl. ¶ 3, Dkt. No. 94-2; Pepe Decl. ¶ 51, Dkt. No. 108-1.

Plaintiff's Charge of Discrimination and Complaint

Plaintiff filed a Charge of Discrimination ("Charge") with the EEOC on January 15, 2024. Def.'s Ex. 25, Dkt. No. 94-25. In the Charge, Plaintiff alleged disability discrimination based on her anxiety beginning on August 17, 2023. *See id.* Thereafter, Plaintiff filed a Complaint alleging three causes of action: (I) FMLA Interference, (II) FMLA Retaliation, and (III) Violation of the ADA. Defs.' UF ¶ 43, Dkt. No. 94.

### B. STANDARD

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1290 (10th Cir. 1999). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. In deciding a motion for summary judgment, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995).

Initially, the moving party bears the burden of showing that no genuine issue of material fact exists. *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the nonmoving party must show that genuine issues remain for trial. *Id.* The nonmoving party must go beyond the pleadings and must designate specific facts derived from admissible evidence (affidavits, depositions, answers to interrogatories, or admissions) demonstrating a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). If there is no genuine issue of material fact in dispute, then the court must determine whether the movant is entitled to judgment in its favor as a matter of law. *See Jenkins v. Wood*, 81 F.3d 998, 990 (10th Cir. 1996); *Celotex Corp.*, 477 U.S. at 322.

### C. ANALYSIS

#### 1. FMLA claims

The FMLA provides eligible employees with 12 weeks of leave, including taking leave intermittently when medically necessary, during any 12-month period if a "serious health condition" prevents such an employee from performing the functions of her job. *See* 29 U.S.C. § 2612(a)(1)(D), (b)(1). "The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempt to exercise any right provided under the FMLA." *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)).

##### a. FMLA interference claim

To succeed on an FMLA interference claim, "an employee must show that (1) [she] was entitled to FMLA leave, (2) an adverse action by [her] employer interfered with [her] right to take FMLA leave, and (3) this adverse action was related to the exercise or attempted exercise of the employee's FMLA rights." *Brown*, 700 F.3d at 1226. The first element is satisfied when the employee shows that she would have qualified for leave under the FMLA. *Tadlock v. Marshall County HMA, LLC*, 603 F. App'x 693, 709 (10th Cir. Feb. 25, 2015) (citing *DeFreitas v. Horizon Inv. Mgmt. Corp.*, 577 F.3d 1151, 1159 (10th Cir. 2009)). To qualify for FMLA leave for her own medical condition, the employee must have a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

With respect to the second element, adverse actions amounting to interference include preventing an employee from taking the full 12 weeks of leave guaranteed by the FMLA, denying reinstatement following leave, denying initial permission to take leave, or discouraging an employee from using FMLA leave. *See Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007); 29 C.F.R. § 825.220(b). Failing to follow the FMLA notice requirements

"may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights." 29 C.F.R. § 825.300(e). "A deprivation of these rights is a violation regardless of the employer's intent, and the *McDonnell Douglas* burden shifting analysis does not apply." *Brown*, 700 F.3d at 1226-27.

If the employee satisfies the first two elements, the burden shifts to the employer to show that the adverse decision was not related to the exercise or attempted exercise of the employee's FMLA rights. *Dalpiaz v. Carbon County*, 760 F.3d 1126, 1132 (10th Cir. 2014). An employer can defend against the interference claim, for example, by demonstrating that it would have terminated the employee anyway, regardless of the request for FMLA leave. *Brown*, 700 F.3d at 1227.

Here, Defendants do not dispute that Plaintiff qualified for leave as a long-term employee who had worked at Sandia for more than 12 months and 1,250 hours during the 12 months prior to her request for leave. MSJ 12, Dkt. No. 94. Nor do they challenge at this stage that Plaintiff's anxiety amounted to a serious health condition. Instead, Defendants contend that Plaintiff failed to request leave, as necessary to show entitlement to FMLA leave. Defendants argue that they are entitled to summary judgment on Plaintiff's interference claim because (i) it is undisputed that she knew how to request FMLA leave; (ii) prior to November 15, 2023, she never notified them that she had an FMLA qualifying condition based on her anxiety or that she wanted to request FMLA leave for her anxiety; and (iii) after she requested FMLA leave, they never denied her leave.

For her part, Plaintiff asserts that Defendants interfered with her right to take leave by failing to give her notice as early as August 17, 2023, or September 13, 2023, that the anxiety she reported to her manager might qualify for FMLA leave. Had she been given that notice, Plaintiff insists she would have taken the protected leave earlier, stabilized her condition, and returned to

her job without the impending PEP deadlines. She also contends that Defendants impermissibly discouraged her from using FMLA leave when they placed her on a PEP.

The FMLA requires several kinds of notice that an employer must give in various circumstances. *See* 29 C.F.R. § 825.300. Plaintiff relies on 29 C.F.R. § 825.300(b)(1): "When an employee requests FMLA leave, *or when the employer acquires knowledge that an employee's leave may be for an FMLA–qualifying reason*, the employer must notify the employee of the employee's eligibility to take FMLA leave within five business days, absent extenuating circumstances." 29 C.F.R. § 825.300(b)(1) (emphasis added). "Accordingly, if the employer learns from any source—whether from the employee or otherwise—that the employee's leave might be for family or medical reasons, it is obligated to provide both types of notice." *Graves v. Brandstar, Inc.*, 67 F.4th 1117, 1121 (11th Cir. 2023).

The employee, however, must first seek *leave* to trigger an employer's duty to give eligibility notice. *Id.* at 1122 ("The Family and Medical *Leave* Act requires, at the very least, that an employee actually seek leave—of some sort—to trigger an employer's obligation to give eligibility and rights-and-responsibilities notice. [T]he operative notice regulation requires either that an employee specifically 'request[ ] FMLA *leave*" or that the employer 'acquire[ ] knowledge that an employee's *leave* may be for an FMLA-qualifying reason.'") (quoting 29 C.F.R. § 825.300(b)(1)) (emphasis in original); *Coutard v. Municipal Credit Union*, 848 F.3d 102, 109-10 (2d Cir. 2017) (explaining that to prevail on FMLA interference claim plaintiff must show she gave notice to defendant of intent to take leave); *Crowell v. Denver Health and Hosp. Authority*, 572 F. App'x 650, 653 (10th Cir. July 23, 2014) ("In requesting leave, employees need not expressly assert rights under the FMLA or even mention the FMLA but may only state that leave is needed."). The employee must provide sufficient information for the employer to reasonably

determine that the leave may qualify under the FMLA. *See Coutard*, 848 F.3d at 110 (quoting 29 C.F.R. pt. 825, App'x C); *Crowell*, 572 F. App'x at 653 (explaining that employee must impart sufficient information to employer to reasonably apprise it of employee's request to take time off for serious health condition). The employee, however, need not mention the statute itself, so long as the employer knows of the employee's need for leave. *See Byrne v. Avon Products, Inc.*, 328 F.3d 379, 382 (7th Cir. 2003). An employee's sudden, extremely unusual change of behavior may even provide an employer knowledge of an FMLA medically qualifying leave event. *See id.* at 381-83. After the employee provides adequate notice, the employer then must inform the employee whether she is eligible for FMLA leave and specify any additional information required to make the eligibility determination. *Coutard*, 848 F.3d at 110. The adequacy of the employee's notice is usually a fact question for the jury. *See id.* at 109; *Clinkscale v. St. Therese of New Hope*, 701 F.3d 825, 827 (8th Cir. 2012).

Plaintiff points to two occasions that triggered Defendants' notice obligations prior to November 15, 2023. First, she asserts that she told Defendant Shelton by August 17, 2023, that workplace leadership was triggering significant anxiety. According to Plaintiff, Defendant Shelton told her to "get over it." Second, Plaintiff draws the Court's attention to September 13-14, 2023, when Plaintiff told Defendant Shelton that she was attending EAP counseling because of her stress and anxiety about work and informed her management chain of her panic attack diagnosis at the Sandia Medical Facility.

Knowledge of a possible medical condition, however, does not trigger an employer's notice obligation until the employee seeks leave or indicates an intent to seek leave. *Cf. Graves*, 67 F.4th at 1121-23 (explaining that email in which employee told employer she intended to fly to her father's emergency surgery and would not be available for calls/edits was sufficient to trigger

employer's duty to provide eligibility and rights-and-responsibilities notice because employer acquired notice that leave might be for FMLA-qualifying reason, but notice obligations were not triggered in different email in which employee did not request leave nor give employer knowledge that she wanted leave for FMLA-qualifying reason). *See also Mares v. Colorado Coalition for Homeless*, No. 21-1001, 2021 WL 5811232, at *2 (10th Cir. Dec. 7, 2021) (affirming summary judgment on FMLA interference claim where employee did not provide proper notice of need for FMLA leave; employer was not required to discern that employee sought to comply with notice requirement or sought FMLA leave). Plaintiff admits as much in her surreply. *See* Pl.'s Surreply 2, Dkt. No. 144-1 at 2 of 10 ("Defendants are correct that mere awareness of a medical condition, standing alone, does not automatically trigger FMLA duties."). Consequently, while the cited evidence may create a fact issue as to whether Defendants knew that Plaintiff suffered from anxiety, a potential FMLA qualifying medical condition, that is not enough to show actionable interference because she did not indicate that she wanted to take leave for her condition.

Plaintiff nonetheless argues that Defendants "had information from which a reasonable jury could find that Plaintiff was experiencing panic and anxiety-related symptoms affecting her at work, that those symptoms had become serious enough to affect her ability to navigate job demands and attendance-related expectations, and that leave-related protections may therefore be implicated." *Id.* The Court disagrees that the evidence presented about Plaintiff's medical condition and work performance is enough from which a jury could find that Defendants knew that Plaintiff sought and needed leave for her anxiety condition prior to November 15, 2023. For example, there is evidence that Plaintiff informed Defendant Shelton about her anxiety issues in several meetings after Shelton became her manager. *See* Pepe Decl. ¶ 20, Dkt. No. 108-1. But there is nothing to indicate she asked for leave at that time. As for Plaintiff's treatment at Sandia's health

center, she did not work during the several hours she was there. Sandia's policy, however, is that an employee does not need to use time off when using the onsite health center, so she never requested leave. Then, Plaintiff chose to work from home that afternoon, rather than request leave. Therefore, there are no facts from which a reasonable jury could infer that Plaintiff requested leave or indicated a future intent to use leave for her anxiety condition on or around September 13-14, 2023. Because Plaintiff failed to provide proper notice of her intent to take FMLA leave, Sandia's notice obligations were not triggered.[10] Defendants are therefore entitled to summary judgment on Plaintiff's interference claim based on the theory that they failed to follow the FMLA notice requirements.

The Court turns now to Plaintiff's second theory: discouraging an employee from using FMLA leave may constitute interference. *See* 29 C.F.R. § 825.220(b). The record here, however, does not contain facts from which a jury could conclude that Defendants discouraged her from taking FMLA leave. Plaintiff relies on the evidence that they presented her with the PEP and four options on October 26, 2023, after she expressed ongoing anxiety to Defendant Shelton and sought emergency treatment for a panic attack. As discussed, Defendants did not receive notice from Plaintiff that she intended to *seek leave* for her condition until after they presented her with the PEP. There is no evidence that Defendants placed her on a PEP to discourage her from taking FMLA leave. As for Plaintiff's subjective belief that she was afraid to exercise her FMLA rights for fear of not meeting her PEP deadlines, Plaintiff's subjective belief is not enough where there was no conduct by Defendants to discourage FMLA use. Plaintiff's performance problems pre-

[10] Plaintiff argues that Defendants should not be able to hide behind this system where an employee receives medical care without needing to take leave, relieving Sandia of its notice obligations. The Court declines Plaintiff's invitation to impose greater notice obligations on Sandia merely because they have instituted a generous medical care and leave policy that allows employees to make use of onsite medical care without needing to take any leave. FMLA is a leave statute, and notice is tied to an employee's indication that she needed leave, regardless of whether the employee chose to use onsite medical care without asking for leave.

dated Defendants' knowledge of her anxiety condition. Defendants submitted considerable evidence to meet their burden to show that the decision to place Plaintiff on a PEP was not related to the exercise or attempted exercise of the employee's FMLA rights.

In sum, it is undisputed that once Plaintiff sought leave on November 15, 2023, Defendants provided all the leave that was due. *Cf. Graves*, 67 F.4th at 1122 (rejecting interference claim where employee received leave requested in email and received full pay for those days). Plaintiff failed to request leave to activate Defendants' notice obligations prior to November 15, 2023, and there is no evidence that placing her on a PEP was done to discourage her from taking FMLA leave. Defendants placed her on a PEP before she first requested FMLA leave on November 15, 2023. Defendants are therefore entitled to summary judgment on Plaintiff's FMLA interference claim. *Cf. Mares v. Colorado Coalition for the Homeless*, No. 19-cv-03144-MEH, 2020 WL 7230625, at *6 (D. Colo. Dec. 8, 2020) (explaining that, because FMLA requires employee to take cognizable step toward requesting leave, Plaintiff failed to meet second element based merely on employer's knowledge of condition).[11]

**b. FMLA retaliation claim**

"The FMLA makes it unlawful for an employer to retaliate against an employee for exercising her rights to FMLA leave." *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) (citing 29 U.S.C. § 2615(a)). A plaintiff may show intentional discrimination by direct or indirect evidence of discrimination. *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017). For an FMLA retaliation claim supported by indirect evidence of discrimination, the analysis follows the familiar burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). *Id.*; *Brown*, 700 F.3d at 1229. To establish a prima face claim

[11] Given this ruling, the Court does not need to reach Defendants' additional argument that Plaintiff failed to establish prejudice.

for FMLA retaliation, Plaintiff must demonstrate that "(1) she engaged in protected activity, (2) the employer took a materially adverse action, and (3) there is a causal connection between the two." *Khalik*, 671 F.3d at 1193. If the plaintiff establishes a prima facie case of retaliation, the defendant has the burden of coming forward with a legitimate, non-discriminatory reason for the adverse action. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1135 (10th Cir. 2003). The employer's burden is one of production, not persuasion. *Id.* If the employer satisfies its burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reason offered was a mere pretext for discrimination. *Id.*

Defendants argue that Plaintiff cannot satisfy the adverse action and causal connection elements of the prima facie case and that they had a legitimate non-discriminatory reason for placing her on a PEP. For her part, Plaintiff maintains that the PEP and subsequent pressure campaign were adverse actions because they were mechanisms designed to force her out of her management role. Plaintiff considers the pressure campaign to be "threatening termination unless Plaintiff found a new job, setting a job-search deadline over the December holiday shutdown when SNL was closed for two weeks, reassigning Plaintiff's management responsibilities while she was still employed, and posting her position for hire while she remained on payroll." Pl.'s Resp. 22, Dkt. No. 108. She argues that a causal connection exists because "the relevant timeline, properly understood, runs from at least September 14, 2023, when Defendants had actual notice of Plaintiff's disability and her right to FMLA protection." *Id.*

For the reasons discussed above, the admissible evidence does not demonstrate that Defendants had notice of Plaintiff's intent to take FMLA leave prior to November 15, 2023. Defendant Shelton's negative performance reviews and the resulting PEP preceded Plaintiff's initial request for leave on November 15, 2023. On October 26, 2023, Defendants notified her of

her four options: accept the PEP, resign, request committee review of the decision that could end in termination, or voluntarily step down to search for a new position. Plaintiff initially chose the PEP route. Subsequently, Defendant Shelton informed her that her PEP plan was insufficient, and on or about November 14, 2023, told Plaintiff that she had not shown improvement that week and detailed her deficiencies in multiple performance areas. At that point, Plaintiff feared she would fail the PEP, so the next day, she requested FMLA leave and inquired whether there was an opportunity for her "to step down from management." Defs.' Ex. 15, Dkt. No. 94-15 at 1-2 of 3. Defendants placed Plaintiff on the PEP prior to learning that Plaintiff intended to use FMLA leave. Plaintiff's decision to change course and pursue voluntarily stepping down from management occurred at the same time she first requested FMLA leave.

"A causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002) (internal quotation marks omitted). A "plaintiff cannot prove a causal connection when the decision maker took the challenged employment action without knowledge that the plaintiff was taking FMLA leave." *Utter v. Colclazier*, 714 F. App'x 872, 881 (10th Cir. Nov. 6, 2017) (citing *Sabourin v. Univ. of Utah*, 676 F.3d 950, 958-59 (10th Cir. 2012)). Plaintiff has not shown that she indicated an intent to take FMLA leave prior to November 15, 2023. At the time they issued the PEP, Defendants did not know that Plaintiff intended to take FMLA leave. Where knowledge is lacking, the protected activity cannot have caused the adverse employment action. *Id.* Consequently, even assuming Defendants' issuance of the PEP or subsequent steps constituted an adverse action, an issue this Court need not decide, Plaintiff has not presented evidence that Defendants issued the PEP or enforced it in retaliation for Plaintiff's protected activity under the FMLA. *Cf. Sabourin*,

676 F.3d at 958-59 (affirming grant of summary judgment in favor of employer on plaintiff's FMLA interference and retaliation claims where uncontradicted evidence showed supervisor decided to lay off plaintiff before she learned he might take FMLA leave); *Didier v. Abbott Labs.*, 614 F. App'x. 366, 378 (10th Cir. July 31, 2015) (affirming summary judgment dismissing FMLA retaliation claim because plaintiff did not present evidence that persons responsible for terminating her knew she was taking FMLA leave).

Plaintiff additionally argues that she was only *considering* changing from the PEP to voluntarily stepping down from management, and Defendant instead pushed her into accepting a demotion out of management. Even if that assertion were true, Plaintiff has not presented enough facts for a reasonable jury to find that Defendant's actions were because Plaintiff chose to take FMLA leave, rather than because of Plaintiff's perceived poor performance. Again, Defendants placed Plaintiff on the PEP and documented her failures to improve prior to her indicating she wanted to take FMLA leave. The four options they presented to her were those set forth in Sandia's formal action policy. Moreover, Plaintiff informed Defendants she wanted to step down from management the same day she said she wanted to take FMLA leave. Defendants provided her extensions of time to search for another position. The record does not support the inference that Defendants' actions in moving forward with her stated intention to step out of management and not reversing course were related to her taking FMLA leave.[12]

For the foregoing reasons, Plaintiff cannot show the requisite causal connection. Defendants are therefore entitled to summary judgment on the FMLA retaliation claim.[13]

---

[12] As for Plaintiff's contention that Defendants set a job application deadline during the time Sandia was shut down for two weeks over the holidays, the Court agrees with Defendants that she misstates the record. It is undisputed that Plaintiff received extensions of time to continue applying for alternative positions at Sandia beyond the holiday season.

[13] Given this ruling, the Court does not need to reach Defendants' alternative grounds for granting summary judgment. Nevertheless, as discussed in the next section, Defendants established a legitimate, non-discriminatory reason for any

### 2. ADA claim

#### a. Exhaustion of administrative remedies

To exhaust administrative remedies, an individual claimant must timely file a charge of discrimination with the EEOC and receive a right-to-sue letter. *Foster v. Ruhrpumpen, Inc.*, 365 F.3d 1191, 1194 (10th Cir. 2004). The purpose of the exhaustion requirement is twofold: (i) to give notice of the alleged violation to the defendant and (ii) to give the EEOC a chance to conciliate the claim. *Smith v. Cheyenne Retirement Investors L.P.*, 904 F.3d 1159, 1164 (10th Cir. 2018). Courts liberally construe the plaintiff's charge, but it must contain facts concerning the discriminatory and retaliatory actions underlying each claim. *Id.* The key question for exhaustion is whether the conduct alleged in the lawsuit could be expected to fall within the scope of the administrative investigation that would reasonably follow from the discriminatory acts alleged in the EEOC charge. *Id.*

"Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and each "incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'" *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Unlike a claim of discrimination based on a discrete act that itself is actionable, hostile work environment claims are based on the cumulative effect of individual acts. *Id.* at 115. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117.

Defendants contend that Plaintiff filed her Charge of Discrimination for disability discrimination due to her anxiety on January 15, 2024, so she cannot base her ADA claim on any

---

adverse actions they took, and Plaintiff failed to show pretext. The Court's conclusions as to the ADA claim would likewise support granting summary judgment on Plaintiff's FMLA retaliation claim on these alternative grounds.

discrete acts of purported discrimination occurring after her Charge. They additionally contend that the Charge does not allege a hostile work environment, so she cannot pursue that theory. Disagreeing, Plaintiff replies that the investigation of the facts of her Charge "would reasonably encompass the entire course of conduct – including Shelton's 'get over it' comment, the rushed PEP process, the denials of telework, and the constructive demotion – because all of those events bear directly on whether Defendants engaged in good faith with Plaintiff's disability." Pl.'s Resp. 24, Dkt. No. 108.

Plaintiff's Charge alleged that Sandia was aware that she was experiencing anxiety attacks and that shortly thereafter she received her first poor performance review, resulting in her being placed on a PEP. Defs.' Ex. 25, Dkt. No. 94-25 at 1 of 2. She further stated that Sandia failed to initiate any discussion regarding reasonable accommodations, to accommodate her severe anxiety, or to grant her request to attend one-on-one meetings remotely; instead, they pressured her to make career decisions under extreme duress. *Id.* at 1-2. According to the Charge, Defendant Shelton construed Plaintiff's inquiries about stepping down from her managerial role as an irrevocable agreement to leave her position. *Id.* at 2. Plaintiff alleged that Sandia told her she would be terminated if she did not find another position. *Id.* She further asserted they denied her "the progressive procedures that she is guaranteed if there were actually a legitimate problem with her work performance, and essentially terminates her specifically because she has an anxiety disorder." *Id.* The allegations plainly encompass a failure to accommodate ADA claim.

Contrary to Plaintiff's argument, however, the Charge could not reasonably be construed as alleging a claim based on depression or a hostile work environment. Nowhere in the Charge does she use those or similar terms. To succeed on a hostile work environment claim, the plaintiff must show facts that "the workplace was permeated with discriminatory intimidation, ridicule, and

insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Davis v. U.S. Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998). Plaintiff's Charge does not describe the type of severe or pervasive conduct that would prompt an investigation into a hostile work environment. Defendants are therefore entitled to summary judgment on an ADA claim based on a hostile work environment theory for failure to exhaust administrative remedies. *Cf. Mitchell v. City and County of Denver*, 112 F. App'x 662, 667-68 (10th Cir. Oct. 12, 2004) (concluding that plaintiff failed to exhaust hostile work environment claim where he failed to include facts in EEOC charge about treatment in manner or degree sufficiently severe or pervasive to alter conditions of employment and create abusive working environment).

As for a discrimination claim based on demotion, demotion is a discrete act that constitutes a separate actionable unlawful employment practice that must be exhausted. *See Morgan*, 536 U.S. at 114; *Sharpe-Miller v. Walmart, Inc.*, 181 F.4th 1037, 1051-52 (10th Cir. 2026). Although it was not clear at the time what position Plaintiff might obtain, Plaintiff alleges in her Charge that she was pressured to step down from her managerial role because of her disability. Consequently, the investigation that could reasonably follow her administrative Charge would encompass forcing her to relinquish her managerial position and accept a non-management role. The Court's analysis will thus proceed on the ADA theories that Plaintiff exhausted – failure to accommodate and disability discrimination that resulted in her demotion.

**b. Disability discrimination**

The ADA prohibits employers from discriminating against a qualified employee on the basis of disability in regard to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). If a plaintiff offers no direct evidence of discrimination, the Court applies the *McDonnell*

*Douglas* burden-shifting analysis. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011). To establish a prima facie case of discrimination, a plaintiff must demonstrate that she (1) is a disabled person within the meaning of the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of her job; and (3) suffered an adverse employment action because of her disability. *Scheer v. Sisters of Charity of Leavenworth Health System, Inc.*, 144 F.4th 1212, 1215 (10th Cir. 2025). Once a plaintiff demonstrates a prima facie case, the burden shifts to the employer to show a legitimate, nonretaliatory reason for the adverse employment action. *Brown*, 700 F.3d at 1229. If the employer meets that burden, to avoid summary judgment, the employee must show that there is a genuine dispute of material fact as to whether the employer's reasons for the adverse action are pretextual. *Id.* Here, the Court may assume without deciding that Plaintiff satisfied her burden on the prima facie case, because it concludes that Defendants met their production burden of showing a nonretaliatory reason for the purported adverse actions and Plaintiff failed to satisfy her burden to show pretext.

Defendants contend they had legitimate, non-discriminatory reasons for the actions they took – Plaintiff's documented performance problems. *See* MSJ 20-22, 24, Dkt. No. 94 (incorporating FMLA *McDonnell Douglas* burden-shifting arguments to ADA claim). Indeed, Defendants supported their articulated reason with evidence of performance issues dating from January 19, 2023, and continuing up to the issuance of the PEP. Rhinehart informed Plaintiff on January 19, 2023, that Plaintiff's performance had not improved, and staff continued to complain about her lack of attendance and responsiveness. In April 2023, Rhinehart chastised Plaintiff for failing to understand earlier feedback he gave to stop working on developing a training budget, and instead to focus on the outlined priorities. Rhinehart again emailed Plaintiff on May 1, 2023, about her continued performance problems. He noted that, had documentation been better, she

would have been given a lower elbow rating in FY22, she started FY23 needing significant improvement in performance, but she had not shown the necessary improvement. More specifically, he said she did not finish tasks she started and did not focus on the real priorities. Defendant Shelton also documented Plaintiff's performance issues, to include lack of communication, lack of coordination, and providing incorrect information. Given this evidence, Defendants met their burden of offering a non-discriminatory reason for the adverse employment actions.

The burden thus shifts back to Plaintiff to show that there is a genuine dispute of material fact as to whether Defendants' proffered reason is pretext for unlawful discrimination. *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1259 (10th Cir. 2001). A plaintiff may show pretext by producing evidence that the proffered reason is factually false. *Plump v. Government Employees Ins. Co.*, 161 F.4th 1222, 1233 (10th Cir. 2025) (quoting *DePaula*, 859 F.3d at 970). A plaintiff may also meet her burden "by revealing weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem the employer's reason unworthy of credence." *Id.* (quoting *DePaula*, 859 F.3d at 970) Temporal proximity supports a finding of pretext "only in combination with other evidence of pretext." *Id.* at 1237. *See also Brown*, 700 F.3d at 1230 (explaining that, to raise fact issue of pretext, plaintiff may present evidence of temporal proximity plus circumstantial evidence of retaliatory motive). "At all times, the plaintiff retains the ultimate burden of proving such discrimination." *Selenke*, 248 F.3d at 1259.

To show pretext here, Plaintiff points to the timing of her negative performance ratings and the PEP. Indeed, timing of an adverse action closely following protected conduct may justify an interference of retaliatory motive. *Id.* at 1260. As Plaintiff highlights, Defendant Shelton began

entering negative reviews for Plaintiff less than one business day after receiving notice of her panic attack. But temporal proximity alone is not sufficient, and Plaintiff failed to show the additional circumstantial evidence necessary to buttress the inference to be drawn from the timing. Instead, the evidence points to the contrary conclusion that the purported adverse actions and disability are not linked.

Significantly, Defendants gave Plaintiff numerous informal negative performance reviews prior to Plaintiff informing Defendant Shelton of her anxiety issues. Plaintiff attempts to make a factual question out of evidence that Rhinehart forwarded emails to Defendant Shelton six hours after she entered her below-expectations rating. She urges the Court to view the forwarded emails as evidence that Defendant Shelton began constructing a paper trail to force Plaintiff out of management in direct response to learning of her disability. It is undisputed, however, that the paperwork existed and preceded Plaintiff's anxiety attack. As Plaintiff herself emphasizes, Rhinehart viewed her as a "daily chore" and conveyed as much to Defendant Shelton when she took over as Plaintiff's manager. Defendant Shelton emailed Plaintiff with her own concerns about Plaintiff's performance. Consequently, the record reveals that Defendants documented Plaintiff's performance issues months before she gave them notice of her medical condition.

Next, Plaintiff highlights evidence she says undermines the argument that she had performance deficiencies. Plaintiff directs the Court's attention to Rhinehart's May 1, 2023, email, wherein he noted that her behavior had improved tremendously. Defendants, however, focused on Plaintiff's *performance* issues. Rhinehart's email explained that she started the FY23 performance period needing significant improvement in performance *and* behaviors, but he had not seen much improvement on the performance side. Because her negative *performance* reviews led to her PEP, her improved behaviors do not establish pretext.

Moreover, when evaluating pretext, a court must keep in mind that it is the employer's perception of the plaintiff's performance, not her own subjective evaluation of her own performance that matters. *Selenke*, 248 F.3d at 1260. A court considers the facts as they appeared to the decisionmakers for the employer. *Bennett v. Windstream Communications, Inc.*, 792 F.3d 1261, 1268 (10th Cir. 2015). The court does not ask whether the employer's decisions were wise or fair; rather, the court only considers "whether the employer honestly believed its reasons and acted in good faith upon them." *Id.* (quoting *Riggs v. AirTran Airways, Inc*., 497 F.3d 1108, 1118-19 (10th Cir. 2007)). Plaintiff does not offer objective evidence to cast doubt on Defendants' belief that she had performed poorly. Even more telling, in the optional comments section of the negative performance review, Plaintiff acknowledged that the information was "actionable," and she would work "to correct course." Defs.' Ex. 9, Dkt. No. 94-9 at 13 of 14.

Finally, Plaintiff contends that Defendants skipped requisite informal steps for the performance improvement process and rushed the formal PEP upon learning of her medical condition. In support, Plaintiff relies on Rhinehart's deposition testimony in which he described Sandia's informal actions for performance to include emails or written documentation to the employee that describe expectations with the next step being an MOE. Rhinehart Dep. 16:10-17, Dkt. No. 108-10. As he explained, however, both steps may take the form of emails communicating expectations. *See id.* at 16:10-17:12. Through his emails and efforts, Rhinehart considered Plaintiff to be in the informal process to try to improve her performance. *See* Rhinehart Dep. 37:1-14, Dkt. No. 108-11. Contrary to Plaintiff's representation, Rhinehart did not testify that an MOE was a required precursor to formal proceedings or that he would have taken additional informal steps and/or an MOE before proceeding with formal discipline. Instead, the record demonstrates that Defendants had already begun the informal steps in Sandia's performance improvement process

prior to them learning of Plaintiff's medical disability. According to Defendants' policy, an employee failing to "meet expectations" proceeds to the formal actions and a PEP, which is what occurred after Plaintiff received the below expectations rating. *See* Defs.' Ex. 10, Dkt. No. 94-10 at 4-6 at 15. Plaintiff has thus not submitted sufficient evidence to demonstrate that Defendants did not follow their own policies upon learning of her disability.

To recap, construed in Plaintiff's favor, the record establishes that her managers developed negative perceptions of Plaintiff's performance and launched the performance improvement process well before learning of her disability. Because Plaintiff failed to show circumstantial evidence of pretext, the evidence of temporal proximity is not enough to sustain her claim. *See Plump*, 161 F.4th at 1237; *Selenke*, 248 F.3d at 1260-61 (holding that employer's timing of discharge within month of employee's request for additional testing of her work environment to help with her sinus condition, while some evidence supporting her claim, was not enough to show that employer's reasons for firing her were pretextual). Plaintiff failed to meet her burden of showing a genuine dispute of material fact exists as to whether Defendants engaged in unlawful discrimination under the ADA. The Court will therefore grant summary judgment to Defendants on her ADA disability discrimination claim.

**c. Failure to accommodate**

"Under the ADA, prohibited discrimination includes failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 967 (10th Cir. 2002) (internal quotations omitted). When a plaintiff asserts a failure-to-accommodate claim, she bears the burden of showing "the existence of a facially reasonable accommodation." *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1264 (10th Cir. 2009). If plaintiff satisfies that burden, then

the employer must show its inability to provide the requested accommodation. *Id.* The federal regulations outline an interactive process requiring participation by both parties. *C.R. England*, 644 F.3d at 1049. "However, before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *Id.* The employee must make clear that she seeks a particular form of assistance for her disability. *Id.*

According to Defendants, they engaged in the interactive process with Plaintiff, gave her the time off she requested, offered part-time hours, and allowed her to attend meetings remotely to accommodate her stress.[14] Defendants insist that there is no evidence that Plaintiff requested an accommodation that was denied. On the other hand, Plaintiff maintains that she requested the following accommodations that Defendants denied without any interactive process: (1) notification before high-stress meetings so she could prepare; (2) telework on Fridays when she would otherwise be alone in the building, and (3) a modified work schedule to avoid Fridays. Pl.'s Resp. 26, Dkt. No. 108.

Plaintiff neglected to submit evidence to adequately support her contention that she requested the aforementioned accommodations. Arguments of counsel, without evidentiary support, are insufficient to create a question of fact. Nevertheless, Defendants attached evidence to their reply that indicates Plaintiff made some requests for accommodation and that an interactive

[14] Defendants also point to Plaintiff's September 14, 2023, email in which she stated her panic attack was a result of internalizing stress, arguing she affirmatively stated therein that she did not need an accommodation. While the Court agrees that Plaintiff did not affirmatively request an accommodation in the email, neither did she affirmatively decline accommodation. At most, the email gave Defendants notice that Plaintiff suffered from panic attacks, but it did not request reasonable accommodation. *Cf. C.R. England*, 644 F.3d at 1050 (explaining that, when employee refers to needing to see doctor combined with request for time off or reference to disability, it may constitute proof that employee was seeking reasonable accommodation, but fleeting reference to seeing his doctor was not sufficient).

process occurred. *See* Defs.' Ex. 31, Dkt. No. 117-6. Even considering that evidence, the Court concludes it is not enough for Plaintiff to survive summary judgment.

The record demonstrates that Plaintiff engaged in an interactive discussion with Defendants about taking intermittent leave of 3-4 days per month and working from home on days that she did not feel well. *See* Defs.' Ex. 31, Dkt. No. 117-6 at 7-39 of 39.[15] She also asked to work from home on Fridays, presumably based on her expressed concern about working onsite on Fridays alone, a day when fewer employees worked onsite. *See id.* at 25-27 of 39. However, the same record reflects that Defendants discussed with her that, because one employee with whom she felt comfortable worked onsite every other Friday, she should work onsite. *Id.* On the alternate Fridays, Defendant Shelton would check the schedules of other employees and discuss with Plaintiff her comfort level with those employees. *Id.* Plaintiff therefore has not shown that Defendants denied her requests for accommodation without an interactive process or that they failed to offer reasonable accommodation in response to her concerns about Friday workdays. Rather, the evidence indicates Defendants agreed to a modified work schedule as part of the interactive process. *See Hennagir*, 587 F.3d at 1264 (explaining that part-time or modified work schedules may be a reasonable accommodation).

In her Charge, Plaintiff alleged that she requested to participate in one-on-meetings remotely to lesson her anxiety. Defs.' Ex. 25, Dkt. No. 94-25 at 2 of 2. Plaintiff, however, failed to submit evidence that she requested one-on-one meetings as an accommodation for her disability. Further, Defendants attached evidence that one-on-one meetings occurred in December 2023, and she never requested that those meetings be online, rather than in person. *See* Defs.' Ex. 27, Dkt.

---

[15] Notably, Plaintiff's surreply did not dispute that the interactive process occurred or supply evidence refuting that an interactive process occurred.

No. 94-27 at 1-2, 6 of 9.[16] Additionally, when Plaintiff requested that a February 2, 2024, meeting occur remotely, Defendant Shelton agreed. *Id.*

As for her argument that she asked for notification before high-stress meetings so she can prepare for them, she did not allege in her Charge that she requested extra time to prepare. Even were the Court to consider this purported lack of accommodation claim to be exhausted, the evidence upon which Plaintiff relies is insufficient to establish that she requested preparation time as an ADA accommodation. Plaintiff submitted an email she sent to Defendant Shelton and Ms. Doty on November 30, 2023, in which she said that Defendant Shelton directed her to attend the meeting that day even though Plaintiff said she could not attend. Pl.'s Ex. 6, Dkt. No. 108-6. Plaintiff explained therein that the "reason is due to preparation for high stress situations, not difficult conversations, and ensuring I am prepared with potential questions." *Id.* This evidence does not establish that she gave notice she was requesting as a medical accommodation time to prepare before high-stress meetings or that Defendants denied any such request.[17]

Plaintiff has not come forward with sufficient evidence from which a jury could reasonably conclude that she requested reasonable accommodation that Defendants denied or that they did not

---

[16] Plaintiff objects to the Court's consideration of the interrogatory answers as evidence. The Court, however, may consider interrogatory answers when analyzing a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A). Defendant Shelton swore to the veracity of those answers, and Plaintiff failed to dispute the fact with contrary evidence. The Court will therefore consider the contents of Exhibit 27.

[17] Not cited by either party, but in the record, is a portion of Plaintiff's deposition testimony wherein she attests concerning the November 30, 2023, meeting: "This was not what I expected the meeting to be. I was having a panic attack. At that point I remember getting confrontational with Emily and her saying that I have to be willing to have these difficult conversations, and I informed her, 'It is not about a difficult conversation. There's an expectation, and Liliana knew that preparation for a meeting of high intensity is something that I had requested because of my anxiety.'" Pepe Dep. 141:8-15, Dkt. No. 117-1. Because this evidence was not cited or relied on and was only attached in the reply, the Court declines to consider it. *See* Fed. R. Civ. P. 55(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."). Even were the Court to consider this uncited, unhighlighted portion of the record, it would not alter the Court's decision. The deposition testimony does not establish that Defendants understood the request to be for accommodation, failed to engage in an interactive discussion about that request, or failed to make reasonable accommodations. Rather, the record shows an interactive process occurred with numerous accommodations being made.

participate in interactive discussions. Accordingly, the Court will grant summary judgment on Plaintiff's ADA failure-to-accommodate claim.

**IT IS THEREFORE ORDERED** that

1. Plaintiff's *Opposed Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment* (**Dkt. No. 143**) is **DENIED AS MOOT**.
2. Plaintiff's amended *Motion for Leave to File Surreply in Opposition to Defendants' Motion for Summary Judgment* **(Dkt. No. 144**) is **GRANTED**.
3. Defendants' *Motion for Summary Judgment* (**Dkt. No. 94**) is **GRANTED**.
4. This case is **DISMISSED WITH PREJUDICE**.

**SO ORDERED**.

THE HONORABLE GREGORY J. FOURATT
UNITED STATES MAGISTRATE JUDGE
***Presiding by Consent***